The second and last case on our argument calendar this morning is No. 20-2194, Radwan v. Manuel. And I'd like to just say that I would be happy to give you more flexibility on time than I had originally designated. So why don't we start out with, let's say, 15 minutes aside and try to keep to that, okay? And you will have your two minutes. Would you like to change your rebuttal time? I think two minutes should be enough time. Thank you. Okay, let's start out with 15 minutes aside then and try to keep to that. Very good. Mr. Tutte, please proceed. Thank you, Your Honor, and may it please the court. I only have now 15 minutes this morning, and I'd like to reserve the two for rebuttal. So there are a lot of issues in this case. I want to use this time as effectively as possible. So if the court has questions, please don't hesitate to interrupt me and take me where you want to go, because I think that that would be most useful for the panel. I'd like to start with the due process in Title IX issues, then turn to the First Amendment issue in this case. I'll outline each of our claims and then address each in more detail. Defendants violated Ms. Rodwan's clearly established due process rights because she had a clearly established property interest in her one-year, four-cause protected, full-ride athletic scholarship. And UConn's procedures for terminating that scholarship to the degree they employed a procedure at all was grossly inadequate under clearly established law. They failed to provide a pre-deprivation hearing, involve a neutral decision-maker, provide adequate notice, comply with their own deadline they gave in the notice. For purposes of establishing the clearly established law, for purposes of qualified immunity, correct me if I'm wrong. I think you're relying on our decision in, I don't know how to pronounce it, Ezequiel. Yeah, we call it Ezequiel. Okay, that was much better than what I did there. But obviously, that's not exactly on point to the situation we have here. There is an argument to be made that some of the decisions involving employment, you know, those principles would apply to a scholarship. And I understand those arguments. But is it really fair to say that it's clearly established in this circuit that someone with a scholarship has a protected property interest? We think that there's a clearly established law on property interest through two different routes, both of which lead to the same conclusion. One is just from first principles, going back to the Perry v. Sinderman case and Roth in the 1970s all the way, just an unbroken line of cases. The principles are does it have permanence, and is there a substantial deprivation? And here she could establish both because it was her only source of income. It's her only source of money in the world. It was her only way of getting access to education, short of substituting it with some other property that she would have to obtain some other way. So substantial deprivation. And then it itself characterized it as it's a one-year scholarship. And only if one of these very limited things happens, including serious misconduct found by the students, by the normal university disciplinary committee, can it be taken. So it has the permanence. It has the duration. It has the substantial deprivation. First principles. To Ezekiel, which is your question, we think that Ezekiel, on its principles that it found relevant to finding a clearly established property interest, all of those principles are identical in this case. It was clearly important to the student's future. Here, Ms. Rodwan was a very skilled soccer player and potentially could have gone on to become a professional soccer player. So interfering with that sort of part of her education and her development as a soccer player, very, very substantial. Wouldn't this apply then to financial aid too? Suppose you got your financial aid package just as a student and the school says, you know what, we think you lied on your application. You have more money than you told us. We're taking it away. They have a property interest in that. You'd have to give them a pre-deprivation hearing. That may be. It would depend on, of course, how the financial aid is structured. If it was structured with the same type of – don't forget, Goss versus Lopez, which we rely on, says that to have a 10-day school suspension from a public school, you have to have a pre-deprivation hearing. So she's also being denied access to her education, and even a 10-day suspension from school has always been a due process interest protected. Yes, Your Honor. I see you have a question. I'm not doubting that there's some strong arguments that you're making with regard to that. I just don't think – and courts across the country certainly have not come to reach the uniform conclusion that scholarships always qualify as a protected interest. So I'm really focused on the qualified immunity issue, but I don't want to take up all your time on that. No, absolutely, and let me address it as quickly as possible and then move away, which is each should be considered as how it's written. Not every scholarship has this kind of substantial protection. And also, I would say, looking at those cases from other circuits that haven't come out the same way, there's non-renewal and there's termination. Yeah, I know, but that's a school. It's very hard for a school to figure that out. For the purpose of qualified immunity, I think it's difficult. If you're saying you have to look at each situation, that suggests maybe there should be qualified immunity before the court gives a little more guidance on it. But in any event – Could you identify what qualities you think are determinative and distinguish this situation from the other kinds that Judge Bianco is referring to? Absolutely, absolutely. Most importantly, that it's written and forefronted in the contract that this is a protected interest, that you don't have to worry. It's not going to be taken away. You will be a student for at least a year as long as you don't engage in substantial serious misconduct that's found by the student disciplinary committee or student disciplinary process. So it has that quality that it is given to you. You don't have to be living in fear that they can just breach this contract. It's not an ordinary contract. And that was really important to Ms. Roblin. As you can see, she understood the property interest that way. The record discloses that she believed it was guaranteed. She wrote that in an email at the time it was taken, that they had taken her guaranteed scholarship. Let me turn to the procedures. Actually, I've really already said a lot about what our procedural issue is. You know, failed to comply with their own deadline that they gave. And I want to just emphasize, Coach Santera sought to stop her from even using the process by telling her she would not get a good recommendation, that he would not help her transfer, that she took the appeal. So on just the outrageous prong of clearly established, you absolutely have to have a trial on whether or not that's true. If it is true, that is an outrageous and gross violation of due process. Can I just jump in, I'm sorry, on the question one more time? I think you could argue that Ezequiel is less – we're dealing with property interests that are perhaps less permanent and important. That a three-month tour as chief resident is less important to Ms. Ezequiel than an academic scholarship is to your client. And that yours was protected more by contract than that one. But they are, as Judge Bianco is pointing out, very different fact patterns. So what's the best case on qualified immunity that you have for the notion that you can establish that a right is clearly established with a fact pattern that is different in kind, but qualitatively significantly less strong? Does that make sense? Yes, Your Honor. Well, I would point to both this court's cases. We say it in our standard of review section of our briefs. We point to this court's cases, which talk about rights being clearly foreshadowed or obvious being grounds for finding no qualified immunity. And, you know, I mean, a classic fact pattern that ended up being found as no qualified immunity before there was a case on point was filming police officers in discharge of their duties. Classic First Amendment situation. It was found to be clearly established before there was any case about someone actually filming a police officer. So this does happen that you don't have something absolutely on all fours. And it's very hard to get an injunction case where there wouldn't be qualified immunity in these circumstances. Ms. Robyn would have had to find a lawyer who could somehow bring a preliminary injunction when she was struggling to figure out how to even take advantage of their appellate process at the school. She was in the midst of transferring at the time. So very difficult to actually square up another way of making law in this area than to just point out that it's obvious. It's absolutely obvious that you told her that this is guaranteed and that she had the tenure protection. And even if they were sophisticated lawyers and they had looked at things like Ezekiel, they looked at things like Goss versus Lopez, they looked at things like Perry versus Sinderman. And they were sort of up on the case law. I think that they would have readily concluded that we've got to give her some process here, some kind of basic check to make sure that there's not a serious error. Which we think there was a serious error in this case and the process would have made a difference. Mr. Tuck, can I ask you about the First Amendment claim? I tried to write down what I think you were asking us for the holding of this case to be on the First Amendment. So I'm just going to say it and you tell me if I'm misunderstanding what you think the law should be. A vulgar offensive gesture by a college athlete on the field while in uniform is protected by the First Amendment such that a university cannot discipline that athlete for the gesture. Is that the holding you're requesting? No, Your Honor. We don't think the holding has to have that kind of breadth where it actually sweeps in sort of unnecessary or extraneous facts that aren't presented here. I think those are the most basic facts here that it was an offensive gesture on the field in uniform. Aren't those the basic facts? Yes, but those facts, what we say is that those facts are not relevant to the First Amendment analysis in this case. So it's not so much that we're saying the court should have a holding that says like when those things are present, you don't give it. But I understand your question to be asking why aren't those relevant? Why is it that if she is punished for expressing herself in a way that the coaches don't like, why can't that be punished? And that's what I even if she's in uniform, even if she's on the field. Right. Suppose there was every game, suppose you had, I understand those aren't the facts, but we're making a rule for everybody. Absolutely. Suppose after every score of a goal, a player raises the middle finger not, you know, just as a celebratory thing. You're saying that the university can't discipline the student. The student's free to do that for as many times for as long as they like. Right. Wouldn't that be what we would be saying? It's protected. It's protected. It's not protected only one time. It's protected. It'd be protected two times, three times, four times. Right. Your Honor, what we think is clear is that it's the way it's their reason for punishing her, which is that they were embarrassed by the speech. Well, I think it's never been. On page 384, the athletic director did say embarrassing. But in the very next sentence, he was asked, is it unsportsmanlike? And he says it's disrespectful to the competition. It's unsportsmanlike in the sense that it's disrespectful to the competition and that you just engaged in as the other team that participated with it. So, yeah, they did say embarrassing. But the reason that it was embarrassing was that they viewed putting up your middle finger for even a very short period of time in a celebratory fashion is unsportsmanlike and disrespectful. Your Honor, I would point to the oral argument in the recently completed BL versus Mahanoy case where the counsel for Mahanoy said the words disrespectful numerous times. So that the reason that the student punished... In the Supreme Court decision from a few days ago, they said BL specifically put aside this type of case. They said it may be that speech related to extracurricular activities such as team sports would receive special treatment under BL's proposed rule. And then later in the opinion, they said the strength of this anti-vulgarity interest is weakened considerably by the fact that BL spoke outside the school on her own time. And I don't think you can argue here. This is outside the school on her own time. This is a team sport. She's wearing the school uniform. So I don't know that Mahanoy helps you in this case. They're clearly not talking about this type of situation. Moving just to that first sentence. It's actually in a discussion of why they're rejecting BL's proposal that Tinker doesn't apply off campus. And it's not actually adopting that as... No, I understand that. That's why I gave you the second one. Yes. Yes. Thank you. Yes. And then on the second point, this was after the game. If you look at the athletic director's deposition testimony, he says that the reason that they didn't punish the football player who kicked the ball into the stands to the degree you credit this is because it happened during the game and so got a 15-yard penalty. And so that kind of unsportsmanlike conduct is okay, basically, or not grounds to terminate a scholarship. I want to focus on the fact that if they can punish her for doing this, they will make this a condition of every single school activity that happens. And they will put in codes of respect, speech codes in all of those activities. And it's just never been the case that they can condition participation in something that is fundamentally an academic part of the school. Soccer is not something that the school does gratuitously. It's supposed to be part of her education. This is an educational portion of the program. Let me interrupt for just a second to say that Mahanoy took place in a high school context, and we're in a university setting. In both cases, arguments are made about the importance of public representation for the institution, the high school, as well as the university. And that was one factor that bore my own thinking or bears on my own thinking about the qualified immunity question on the First Amendment point, because athletic directors might in both circumstances, I think, consider or will be tempted to consider the public representation of their institution on the sports field. Nonetheless, the cases suggest that there are different standards that apply in the K through 12 versus the university setting. Does that bear at all on how we should look at what the Supreme Court decided in Mahanoy? Yes, absolutely. Judge Carney, you know, in two ways. One is the court was said, basically, in an 11-page 8-to-1 opinion, basically said it wasn't breaking any new ground in finding the high school students' speech protected in circumstances that are in many ways, maybe not on absolutely all floors, but in lots of relevant ways, very similar to this case. Then you have an adult. Here you have a college student. And if you look at our best case, which is, we think, the Papish case about publishing a newspaper at a college where the student is expelled, you know, here functionally expelled, essentially had her scholarship taken away, couldn't afford to attend, had to go to another school, you know. But Papish is not a, he's publishing his own newspaper, right? Not a school-sponsored newspaper. Yes, Your Honor, but we think that that line is a lot thinner than, or is not really as relevant in the case law or in any of the cases as sort of as being, right? Well, but there's this issue of the imprimatur, and here I think it's even more than the school's imprimatur that's at issue. It's the fact that, you know, because the athlete is in uniform at a school soccer game, she's an emissary of the school of sorts. And so, I mean, let me just give you the following hypo. Imagine a college student is on work study for financial aid, and her job role is that she gives college tours to admitted high school students. And the admitted facts are that on those college tours, she's telling the high school students, don't come here. This school has a terrible track record on, you know, racial issues or whatever. Assume it's core political speech that she's engaged in, which is, I think, more than we have here. Do you agree that the school would still be within its rights to terminate my tour guide because of the emissary issue? I do. How is that distinguishable? I do. And, you know, I don't want to reflexively distinguish in the sense that I want to appreciate that that is a real question, especially if you're trying to have a job where someone is supposed to be promoting the school, and that's like part of their job, right? And so receive a salary. In exchange, you do these tasks, even if you were a volunteer. In exchange for getting to be part of the volunteering program, this program is about this. This is what this program is about. We promote the school. And then you're just flatly, grossly deviating from that. You know, here, when you sign up to play soccer, you sign up to play soccer. That's our distinction. We think it's a distinction in the cases that she's closer to an ordinary student in terms of whether her speech bears on her. With Judge Carney's permission. Yes, Your Honor. Please go ahead. And I know I'm over. I'd like to give you another five minutes to address the Title IX question. So, Judge Bianco, please go ahead. I just have one more question on the First Amendment. It's actually following up on something you asked first. The high school versus university. Papish is a good case for you, although I don't think it's exactly on point, obviously. But after Papish, many years after Papish and Hazelwood, in footnote seven, the Supreme Court said, we're not deciding, you know, whether or not the imprimatur, how the imprimatur issue that Judge Comittee pointed to would play out at the university level. So it's for purpose of qualified immunity. This is an open question as of Hazelwood. And I think the ACLU's amicus brief in footnote 10, I think, framed the issue. When I saw that footnote, it framed it exactly the way I was thinking about it. You have Hazelwood and you have Frazier. And they may not apply equally, obviously, at the university level. But that's not the question. The question is, do they not apply at all? In other words, does the university just not have the ability to do this? And in footnote 10, the ACLU said, even if this court determines that a university has greater leeway in disciplining students for extracurricular speech as compared to a purely private speech, so they have something, they say the district court erred in holding that Frazier or any other K-12 case law provides the correct standard. And in the last sentence of that footnote, they say, whatever the scope of the speech that might properly be prescribed on the college field, it cannot be determined, as the district court suggested, by the standard set forth in Frazier. And that may be 100% true. Maybe Frazier's interests aren't the same at the university level. But we have to decide whether they have no interest such that it's completely protected. And on the qualified immunity issue, clearly nobody has spoken to that since Hazelwood in footnote 7 in an authoritative way. I mean, nobody, there's cases out there, but nobody has set that in line as far as I can tell. Unless, you know, I look pretty hard. Oh, yeah, no. Let me, let me. That was a long question, but I'm sorry. Well, let me make my best, my best rebuttal and then turn to title nine, right? And my best rebuttal is, if you go back all the way to Barnett, you know, you know, you can frame it as a non, as like a compelled speech case. But it's really, can you punish a child because their statement is I'm not going to pledge allegiance to the flag, right? Or if they get up and start to pledge allegiance, they say, like, I pledge no allegiance to the flag. Could you send them out of the classroom, punish them, expel them? You know, and we think just case after case after case in an unbroken line says, if you're just a student now, you say, OK, well, what about Hazelwood? What about school sponsored activities? Right. And that's really. She raised her middle finger on the campus walking on campus. We wouldn't be here. Nobody is arguing. She can't raise her middle finger as a student. It's all about the school sponsored event. She's wearing the uniform of the school. That's that's why this case is different. Some of these other cases that you're citing. But go to Hazelwood. And the reason that the other side hasn't raised it, you know, and I was worried I was going to get my best counter arguments of argument. But, you know, the the the issue with Hazelwood is that the court was really concerned with the fact that if you take it too far, it would end up being that they can basically just control everything that a student. There'd be no line between being just a student and having sort of a contract with the school. That's like you're going to be a good student and you're going to say all the right things, et cetera, because everything can be reframed as sort of a privilege of coming to the school. And so I'm just you go to Hazelwood itself. It doesn't really sweep this case in. And so if Hazelwood itself doesn't sweep this case in because it says you have the viewer would have to believe it was actually had the imprimatur of the school. And here we don't think it had that any reasonable viewer or at least it's a fact question. But it's not an imprimatur, but it's a condoning. It's condoning. If you don't take action, the school's condoning what they would say is unsportsmanlike conduct. So it's not no one thinks that school told her to do that, but they still have an interest in not portraying that they're OK with it. Well, they can put out a statement. They put out a statement saying, look, this is inconsistent with our values. This is not how you come women's soccer. We don't agree with with her stance on this or if she had an unpopular political view or other unpopular views. And I think that that would be the way more speech would be the way. Right. Not not taking away her old scholarship. But, you know, I feel like I should just move to Title nine. And so now now now take, you know, four minutes. OK, thank you, Your Honor. You know, our argument on Title nine. This is out. This is not qualified immunity. So we've got two constitutional claims, qualified immunity. This is just the traditional. Can we get to a jury? Do we have enough evidence in this case that some reasonable jury, a reasonable jury could conclude that if Ms. Robyn had been a man, she would have received a less severe punishment based on the evidence in the record viewed in the light most favorable to Ms. Robyn. We think it's a it's a low bar. And we think that she really, really clears it by a lot in this case. So it's pretty clear that, you know, the question of of who are the reasonable comparators is usually a question for the jury. But in this case, the district court opinion, I think, rested in very substantial part on the notion that you can't use comparators where the decisions were made by a different supervisor. What's the best case for you on the idea that the different supervisor issue should not be dispositive here? Well, and I don't want I don't want to run away from the question, which is about law. But we actually think that the record is our best is our best argument here. Ward Manuel is the ultimate decision maker. And she told he told Coach Santerios to punish her. You know, if you if you go through the record, the district judge is saying, look, in the in the comparator situations, the the coach, the football coach, the men's team coach doesn't recommend suspension. And therefore, the comparator disciplinary situations never reach athletic director Manuel. Yes, but this this court and I think it follows that citation in the district court case, I'd have to pull it up. But it's about who the ultimate decision maker is, is really what what you're concerned with. This is who does the the supervisor, you know, is the person who makes is sort of responsible for the discipline. And the issue in this case, we think the record discloses that Manuel was actually talking to the coaches, engaging in soft decision making with them before a formal process was initiated. I'm going to talk for a second. Since we've talked about the emissary argument, the four male athletes who broke curfew in Puerto Rico and were sent home from the tournament struck me as having potentially some of the same emissary issues as Ms. Yes, no, I believe he was on the phone with the coach the night of the incident, the word Manuel, the athletic director, about what to do. And ultimately, you know, no formal athletic department level response was recommended by the coach. But in those conversations, I assume they were working out what do we what do we think the appropriate punishment is, is just sending them home from the tournament enough. And so there was involvement from the athletic department in that incident. And there was evidence in the record that Mr. Manuel was in the stands when the football player kicks the ball into the stands. And he was at the game. Yes, I believe he he testified to that, I believe, in his deposition. So he he was there. And I believe there's also testimony that he spoke to the coach after the game again about the incident. And again, no formal disciplinary request was made. But but there was conversations about what to do. So he's he is he's this kind of soft supervisor in the sense that he is engaging with the coaches. And of course, the the evidence in the record here is like not only was he a soft supervisor, he let it be known. He said a message needed to be transmitted to Coach Santeros that this was not acceptable. And he needed to make sure that this did not happen again. The gesture by Miss Roblon. So in each of the cases, we actually we actually do have that sort of unified decision maker model on the comparators in the sense that he he knows what's happening in these teams in terms of violations of team rules, school rules and rules of sportsmanship. The curfew issue is really interesting because it was widely reported at the time that they had breached curfew and that they were sent home from the tournament since you can't really hide hide it. And, you know, and the same with the kicking the ball into the stands. You know, it was broadcast not on just one, but two television networks at the time. And, you know, these incidents are embarrassing for the school. You have this student who kicks the ball into the stands in a in a way that that hurts the team. They actually had a 15 yard penalty at a critical point in the game, as Director Manuel said. You know, but ultimately, there was no there was no decision to sort of escalate the punishment in the same way. OK, Mr. Yes. Yes. I think we probably should go on to hear from the state and you'll have your three bottle. All right. Thank you. Thank you very much. Ms. McGovern. And let's set the clock at 20 minutes. Give Ms. McGovern plenty of time. Please. Your Honor. Thank you very much. May it please the court. I'm Rose McGovern, state of Connecticut, assistant attorney general. I represent the University of Connecticut, Ward Manuel, Len Santerios and Mona Lucas. This court should affirm the district court's decision granting the defendant summary judgment for three reasons. First, Coach Santerios and Athletic Director Manuel are entitled to qualified immunity on Plaintiff's First Amendment claim. Case law governing student speech is without question unsettled. The recent Supreme Court decision and argument in Mahanoy Area School District versus BL demonstrate that lawyers and judges struggle to reconcile and apply the different cases. Two, with regard to Plaintiff's Title IX claim, Plaintiff failed to satisfy her burden to come forward with evidence that there was a triable issue of fact that defendant's decision to discipline her was at all motivated by her gender. Three, Plaintiff has no protected property interest in her one-year athletic grant need or scholarship. Nonetheless, she was provided all the process she was due under the 14th Amendment notice and an opportunity to be heard. Focusing first on the Plaintiff's First Amendment claim, without question the defendants are entitled to qualified immunity in this case. Qualified immunity, the defendants moved for qualified immunity on the basis of the fact that the clearly established prong was not met. The existing case law from the Supreme Court and this circuit do not provide clear guidance and would not have been sufficiently clear to inform defendants and jurists and Manuel that their actions would have violated the Plaintiff's First Amendment rights. Fraser categorically permits the school to prohibit vulgar, lewd speech and the Supreme Court's decision in Papish, as Your Honor has previously discussed, that involved an underground newspaper where a political view was expressed. In this case, Plaintiff simply showed a middle finger. That is a lewd gesture, a vulgar gesture, in which the school had an interest in restricting that conduct and punishing the Plaintiff for it. The Supreme Court cases in the Second Circuit don't provide clear guidance on the applicability of the Tinker and Fraser line of cases with regard to the school setting and in Papish, decided nearly 14 years prior to Fraser, the court referred to the Tinker standard in evaluating the student's First Amendment rights. It would stand to reason that Fraser would apply to a college and university setting and the school's interest in having the students not engage in lewd and disrespectful conduct during a sporting event applies whether it's in the K-12 setting or the university and college setting. Let me just ask a quick question about that. Would you agree that the cases on the First Amendment rights of students provide much less leeway for the state to regulate in the university setting than in the K-12 setting? There is uncertainty as to the complete applicability of the K-12 school setting cases to the universities, yes, Your Honor. And the Supreme Court has signaled that at the university, that's the marketplace of ideas, that's where all kinds of expression, potentially including on an athletic field where someone might take a knee or wear an armband and so on, that the state has less ability to limit that kind of speech in that setting than where in the K-12 where they sit in loco parentis. Isn't that right? So, Your Honor, the courts of appeals have stated that and then oftentimes they go on to still use the K-12 line of cases. Most recently, the circuit in Collin v. Putt, the court referred to the Hazelwood standard in evaluating the restriction on the student's speech and that was at one of the Connecticut State University systems. So oftentimes the courts of appeal will state that it's not clear how applicable the K-12 First Amendment cases are to colleges and universities, but then they frequently go on to then evaluate the case in light of the K-12. Ms. McGovern, on the issue of the school's interest in regulating lewd or vulgar behavior on a sports team, and you can correct me if I'm wrong, I don't have it in front of me, I think the athletic director testified that if it had occurred during the game, that would have been fine. It was only the fact that it was after the game that it was disciplined. If it happened during the game, it would have been handled by the refs or whatever. What real interest then does the University of Connecticut have in regulating that type of behavior when they're okay with it during the game? Okay, so, Your Honor, just to clarify the record. Am I misstating what the director said? I thought that I saw that. No, Your Honor, that was with regard to the conduct of Andrew Adams when he kicked the football into the stand during gameplay. That was not with regard to... No, no, I know, but he was comparing that, I thought, to this situation, saying the reason this situation is more serious is because it occurred after the game, or am I misunderstanding that? Yeah, Your Honor, I don't believe that the record supports that interpretation. The comparison was made simply with regard to the different time period in which the conduct occurred. It was not with regard to him viewing Ms. Radwan's behavior as more serious because it happened after the game. All right, I think I'm also going into the Title IX issue, but go ahead. Okay. It was objectively reasonable for the defendants to believe that they were not violating Plaintiff's First Amendment rights when they disciplined her for showing her middle finger on national television. There's no political or religious view that she's expressed. In fact, it's unclear what view she was expressing at all. Judge Bolden's decision held that it was a question of fact as to whether the plaintiff has even engaged in protected speech by showing her middle finger. Also, Plaintiff violated numerous codes of conduct, not just the women's soccer team, but also the athletic departments, as well as the American Athletic Conference. And the plaintiff was reprimanded by the conference because of her conduct. She is the only UConn student to have received such a discipline the entire time that UConn was a member of the AAC. Her conduct caused disruption for the team and the athletic department. Immediately following her behavior, the coach had to issue a formal apology as a press release. And then the American Athletic Conference contacted the UConn athletic department inquiring about the plaintiff's conduct and requiring them to focus attention to the plaintiff. Would you agree that embarrassment is not the interest that the school can cite, that the case law says there are a number of different interests, whether it be a high school or university has, but embarrassment is not one of them? Would you agree with that? Well, Your Honor, embarrassment in this sense is the manner in which the plaintiff behaved, which was disrespectful and discourteous. And as came up earlier, you know, Athletic Director Manuel determined that the plaintiff's conduct was disrespectful to not just the opponents and the team, but to the competition itself and to plaintiff. I think embarrassment is all tied in with within those concerns and the reaction that the athletic department had to plaintiff's conduct. I know, but there's no case that says a school can regulate speech because of embarrassment, right? What case says that? I'm not aware of a case, Your Honor, no. I actually say the opposite, right? That's to be something more than embarrassment, interference with the pedagogical interests or, you know, right? Although, Your Honor, Frazier categorically permits a school to re-discipline lewd conduct. There's no requirement of even getting into the motives of the athletic directors. The question is whether Frazier applies equally in the university setting, right? Your Honor, and that's why we're advancing these arguments under qualified immunity, because that is an unsubtle question. All right. Could you address the due process argument, please? I mean, this was momentary behavior, impulsive behavior that at one point a person in authority said anything more than a brief suspension would be excessive. It wouldn't be anything more than that. And it seemed as though, you know, given the steps that UConn took, she was supposed to find new funding to attend UConn or find a scholarship elsewhere, move out of her dorm. I mean, she was basically just thrown out on her ear with no real opportunity to challenge the decision making, certainly not pre-deprivation. And, you know, I thought it was a very ungenerous timeliness decision as to her appeal rights. Why am I wrong in construing it this way, understanding this way? In your view, she had a full and fair opportunity to contest the decision? Absolutely, Your Honor. Without question, she did. First off, the decision related to plaintiff scholarship had nothing to do with whether she could remain at UConn and attend in the spring semester. It had nothing to do, but practically it had everything to do, didn't it? She was not expelled. There was nothing to prevent her from coming back to the university. As far as the school, the school took no action, banning her from coming back and attending as a student. And plaintiff understood that, and she so testified in her deposition that she understood that she was able to return. She's completely dependent upon the scholarship. Can't that be considered in terms of whether or not there's a proper interest? If you're not going to be able to attend the school because you're completely dependent upon the scholarship, why isn't that a relevant factor? Well, Your Honor, would it be a different standard then if the student-athlete came from a fabulously rich family, and the question of means was not going to prevent her from attending the university? So would the rich student not have a protected interest, but arguably Ms. Radwan, based on her... Maybe they all should have a protected interest. I argue that they don't, of course, but I'm just responding to your question, Your Honor. If you assume a property interest... I'm sorry. Assume a property interest for the moment. Why aren't her due process rights violated when the school sends her materials that contradict themselves on the subject of when the clock starts running for her deadline to request a hearing, and she requests a hearing. I think the record pretty clearly establishes that she requests a hearing within the deadline on one of the statements the university has made, and just outside the deadline on the university's other statement. Responding to your question, Your Honor, the notice stated that she needs to request a hearing the date that the notice was received. There's substantial evidence in the record that Plaintiff, in fact, received that notice on the date of the letter itself, which is what the policies and procedures included in the letter provided to Plaintiff, that she needed to request the hearing within 14 business days of the date of the letter. Not only that, the Financial Aid Office reached out to the Plaintiff over a week before the time period expired to determine whether she was going to be requesting a hearing, and she failed to timely make that request. And there was no requirement that the appeal period had to be open-ended. There was a finite period of time. She was given notice. The school followed up with her to inquire about her intentions. She did not timely appeal, and it's noteworthy that the Plaintiff also withdrew from the university the same day that she requested the hearing. At that point, she had already made plans to go to Hofstra University and transfer there. But she doesn't know how the hearing is going to turn out, so maybe she has to proceed in parallel to make sure she has somewhere to go. But the letter of December 22nd from Ms. Lucas says, to make this request, contact my office in writing within 14 business days of the receipt of this letter. Not the date of this letter, but the receipt of this letter, and the record evidence from Ms. Radwan is that she received it two days later. Do you disagree as a threshold matter that if you count from December 24th that the request is timely? I'm sorry, count from what date, Your Honor? From December 24th, which is the date on which Ms. Radwan says she received the letter. Your Honor, the record does not support that at all. She received the letter. It was emailed to her. The date of it was December 22nd. She received that. There's evidence in the record to demonstrate that she received it on December 22nd. Where's the cover email in the record? Oh, I see. At 295. And then, Your Honor, I'd like to point out that in the Mona Lucas letter, she specifically refers, it's a two-paragraph letter, it specifically refers to the procedures, the hearing procedures, policies and procedures, and it directs the plaintiff on when her request for hearing needs to be made to the university, and it clearly states within there that it needs to be 14 business days. But nonetheless, even if that wasn't clear, the university reached out to her to find out if she was going to be requesting a hearing. If she was at all confused about when she needed to make that request, she had every opportunity and ability and an individual to contact to find out and seek clarification about when she had to make that request for a hearing. Maybe you could turn now in your remaining time to the Title IX question and what's your view on the district court's analysis that there were no adequate comparators because the decision makers were different, they were coaches, as I understand it, as well as just what the record shows, whether a jury could reasonably infer disparate treatment in instances of affidavit misconduct. Of course, Your Honor. The plaintiff, before Judge Bolden, only presented evidence of proffered comparators to support her claim of selective enforcement or disparate treatment. She offered no other evidence and Judge Bolden correctly held that no reasonable jury could find that those comparators were similarly situated to her. The court looked at as one factor that the athletes reported to different coaches than the plaintiff. That was not the only factor which he distinguished. Your Honor, on that factor, Mr. Tutte pointed out, and I think he's correct, that the athletic director testified on multiple of these incidents that he reached out to the coach and discussed it with respect to the basketball players. He said, we definitely talked about it. I don't remember if it was before or after you made the decision to send them home with respect to kicking the football in the stadium. He said, we probably talked about it that day after the game. And, obviously, there's evidence that he, that's 701 and 702 of the appendix and 383 of the appendix, he says, in connection with this case, I don't remember if it was exactly that day or if it was the next day, but it was in 24 hours. So, why can't you say you have an athletic director, even though it may be the decision of the coaches, who's reaching down and discussing with them the situation almost immediately after it happens and that he's essentially part of the decision-making process in all of these? Right. So, Your Honor, with regard to the basketball players, the record establishes that Ward Manuel was actually present at the basketball tournament when those events happened. That's even more evidence that it's not a situation where things are going on, decisions being made, and he has no knowledge of them. He's aware of almost, it seems like, almost all of these situations, right? Well, so, Your Honor, with regard to the basketball players, he testified that he had likely spoke to the then head coach, Kevin Olley. There's nothing in the record to say that he directed Kevin Olley, that this is the discipline he should take, or if Kevin Olley even asked him, is this the discipline that I should institute on these four basketball players? Well, there's an issue of fact that he's somehow inserting himself in the decision-making process and setting the tone for the whole department as to how to handle these situations, but I'm not even sure it's a matter of law. If you have a Title VII case where supervisors are treating, you know, people differently based upon a protected class, and you have, like, a vice president who knows all of these things are going on, I'm not aware of a case that would say, well, look, these are all different supervisors. You know, you can't bring a Title VII claim. I'm not sure why it should be any different under Title IX. Well, again, Your Honor, you know, that was only one factor that Judge Bolden looked at. The other factors was the conduct, the behavior, and the timing. So Plaintiff was the only athlete in the entire time that UConn was a member of the AAC conference that was reprimanded. None of the athletes that she puts forward receive such a punishment. But isn't that exactly the issue? And so the district court opinion relies heavily, to my eye, on this different supervisor's issue, and even more specifically on the argument that in these other, you know, post-comparator cases, the immediate coach of the team never made a recommendation to terminate a scholarship, and therefore that question was not squarely presented to the athletic director. And, you know, A, in the Second Circuit,  and B, in a case like this where the students are playing on sex-segregated teams, it's always going to be the case by definition that the first-line supervisor is a different person. And so if you have a situation where, you know, coaches for one gender are not making recommendations to terminate scholarships, and coaches of the female players are, how can it be that the different supervisor issue is dispositive? So, Your Honor, again, Judge Bolden also noted the different conduct of the individuals. So the football player, he kicked the football into the stands. That's not what Ms. Redwine did. She didn't kick a soccer ball into the stands. She showed her middle finger on national television. As far as the basketball players, you know, they broke curfew. And although it was reported, it wasn't televised. They weren't representing the university wearing their uniform. Why is that a question? Why is the comparability of that conduct a question for a jury? How is that properly resolved on summary judgment? Look, Your Honor, it's qualitatively different conduct. It's not comparable. They need to be similarly situated in all material aspects. Which is more serious, Ms. McGovern, an arrest for an assault or momentarily putting up your middle finger after a game? I'm sorry. Or theft? There was another one, the men's soccer team, there was a theft. Which one is more serious, a theft? The football players, Your Honor, those incidents all happened after Ward Manuel was no longer the athletic director. Judge Bolden's decision cites to the record, and it is abundantly clear. About the theft by the player on the men's soccer team. Wasn't that during Director Manuel's? Yes, it was, Your Honor. So which one is more serious, stealing or putting up your finger momentarily in celebration after a game? Which one's more serious? Shouldn't a jury have to decide that? Your Honor, that happened nine months after the plaintiff's behavior. And again, it's not, this is him taking... You're allowed to use, you can use incidents afterwards. There's no barrier to that. It may, you know, jury can consider the timing, obviously, but many cases where you consider the decision makers, you know, in the same timeframe, nine months is not a long time. Your Honor, the student, the soccer player ripped pages out of a book. That happened in the bookstore. It didn't happen while he was representing the soccer team on the playing field at the end of a championship game. There was no focus that was put on the university or the soccer team because of that athlete's conduct, as opposed to the plaintiff's conduct. Well, how about kicking the ball? That was on TV, the kicking the ball into the stadium, right? Everybody saw that. It was a penalty, right? Again, Your Honor, that's, you know, happened during the course of gameplay. That was my question to you 10 minutes earlier. Is there really a difference between unsportsmanlike conduct like that in the game with kicking the ball into the stadium or a second after the game ends? Again, we're talking about whether a jury should decide this, not whether who's right or wrong, you know, from our standpoint, but is that close enough for a jury to decide? Again, I come back to Your Honor, that the conduct was not similarly situated to the plaintiff's at all. It was qualitatively different. All right. Ms. McGovern, why don't you just take a moment to wrap up, please? Okay. With regard to the plaintiff's Title IX claim, as fully briefed, plaintiff had an opportunity to present evidence that she was treated, that the defendant's actions were motivated because of her gender. She could have presented evidence unrelated to comparators. She chose not to do that. And she wholly failed to beat her burden of demonstrating that there was an issue of fact, material issue of fact, with regard to the motivation of the defendants in disciplining her. With regard to the First Amendment claim, upholding the district court's decision granting summary judgment on qualified immunity does not create a bright-line rule that limits the student's speech, limits student's speech generally. Instead, it determines that based upon the facts of this case, it was objectively reasonable for the defendants to believe they were not violating her First Amendment right by enforcing the student-athlete code of conduct. And to the contrary, if summary judgment is reversed, a rule will be established that a college or university cannot, in any way, discipline a student-athlete who makes a lewd or vulgar gesture on national television while representing the school. And this cannot be the case. For these reasons, as well as those in my brief, the district court's decision should be affirmed. Thank you. Thank you very much. Mr. Tutte, you've reserved two minutes for rebuttal. Thank you, Your Honor. And because we've gone so long, I'll try to really limit it to just these two minutes, so I appreciate the time. On Title IX, the athletic director was involved in these decisions. As the court has noted, a lot of fact questions, all of them really more suited to a jury. Could any reasonable jury find that had she been a man, she would have received a less severe punishment? We think a reasonable jury could reach that conclusion. We have the comparators. We also have the process. We also have just the objective fact that the punishment was so severely disproportionate. All of these things, we think, push it to a jury. Let a jury resolve whether or not she was discriminated against under Title IX. On due process, they sent a physical letter. Obviously, the email came on December 22nd. This is three days before Christmas. She said she did not check her email. She says in her verified complaint that she received it on the 24th. It still would have been inadequate notice. It says if you think that this is unfair or unjustified, you have the right to tell us that you don't like it. No indication of the remedy that she could have received. No indication of what kind of arguments, whether she's supposed to make legal arguments or whether she thinks it's unfair. If the court finds there's a property right, which we think that there clearly is, this make-it-up-as-you-go, ad hoc, unwritten, arbitrary process was so grossly inadequate as to be no process at all. On the First Amendment claim, we are not asking for a sweeping holding. This case doesn't require a sweeping holding. For this court to hold that this case is a clear First Amendment violation doesn't speak to innumerable other cases involving someone who berates their teammates, someone who goes to their coach and says disparaging things, someone who is disrupting play, someone who is hurting team morale, someone who is actually on a sports team that polices bad language. This was a fleeting expletive. This is a fleeting expletive case. Athletes on NCAA teams say swear words on the field all the time. If they can punish this, then they can take away scholarships every time a microphone picks up one player swearing to another. And as one of the amici pointed out, if they can punish this, why couldn't they punish her for saying, hell yes, we won? There would be no limit to the First Amendment restrictions on student-athletes. And it was after the game. No one thinks that she was speaking for the team. And the team had many other ways of communicating that this was not consistent with their values and that they found it embarrassing. They didn't have to take away her full-ride scholarship. With that, we urge you to reverse. Thank you very much. Thank you both for your arguments. Very well argued. We will reserve decision. That concludes our oral argument calendar for today. We have two cases on submission. Number 20-2281, United States vs. Gonzalez. And number 20-2910, United States vs. King. We will take those under advisement as well. And I'll ask the clerk to please adjourn court.